636 F.2d 1229
 14 ERC 2161, 205 U.S.App.D.C. 101, 10
Envtl. L. Rep. 20,803
 ENVIRONMENTAL DEFENSE FUND, INC., a Nonprofit New York
Corporation, et al.
v.
Douglas M. COSTLE, as Administrator, Environmental
Protection Agency, et al.
Appeal of AMERICAN IRON AND STEEL INSTITUTE et al.
NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.
v.
Douglas M. COSTLE, as Administrator, Environmental
Protection Agency, et al.
Appeal of AMERICAN IRON AND STEEL INSTITUTE et al.
NATURAL RESOURCES DEFENSE COUNCIL, INC.
v.
James I. AGEE, as Assistant Administrator for Water and
Hazardous Materials, Environmental Protection
Agency, et al.
Appeal of AMERICAN IRON AND STEEL INSTITUTE et al.
CITIZENS FOR A BETTER ENVIRONMENT and Dennis L. Adamczyk
v.
Douglas M. COSTLE, as Administrator, Environmental
Protection Agency, et al.
Appeal of AMERICAN IRON AND STEEL INSTITUTE et al.
 Nos. 79-1473 to 79-1476.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 25, 1980.
Decided Sept. 16, 1980.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Actions Nos. 75-0172, 2153-73, 75-1267, and 75-1698).
 Richard E. Schwartz, with whom Thomas L. Anderson, Washington, D. C., was on the brief, for appellant American Iron and Steel Institute.
 Charles F. Lettow, McLean, Va., for appellants Firestone Tire and Rubber Co. et al.
 Douglas E. Kliever and Mary W. Ennis, Washington, D. C., were on the brief for appellants Union Carbide Corp. et al.
 Jacqueline M. Warren, New York City, entered an appearance for appellees Environmental Defense Fund, Inc. et al.
 James T. Banks, McLean, Va., with whom Ronald J. Wilson, Washington, D. C., was on the brief, for appellees Natural Resources Defense Counsel, Inc. et al.
 Steven Schatzow, Deputy Associate Gen. Counsel, Environmental Protection Agency, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., and Jacques B. Gelin and Michael A. McCord, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellee Environmental Protection Agency. E. J. Shawaker, Atty., Dept. of Justice, and Richard G. Stoll, Atty., Environmental Protection Agency, Washington, D. C., also entered appearances for appellee Environmental Protection Agency.
 Before J. SKELLY WRIGHT, Chief Judge, and SWYGERT* and ROBINSON, Circuit Judges.
 Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Chief Judge:
 
 
 1
 A group of companies, in the chemical, petroleum, rubber, and steel industries[1] and an industry association[2] (collectively "the Companies") appeal from a District Court order denying their motion to vacate a settlement agreement (the Agreement) previously adopted by the court,[3] and granting a motion for modification of the settlement agreement filed by the signatories to the Agreement-five environmental groups[4] and the Environmental Protection Agency (EPA or Agency). Natural Resources Defense Council, Inc. v. Costle, 12 ERC 1833 (D.D.C.1979). The Companies contend that the settlement agreement must be vacated both because it has been superseded by legislation enacted by Congress in 1977, and because each of the lawsuits that were resolved by the Agreement is now moot and must be dismissed. The Companies further contend that in proposing the modifications to the settlement agreement approved by the District Court EPA violated rulemaking and public participation requirements of the Administrative Procedure Act, the Clean Water Act, and its own regulations, as well as requirements of constitutional due process.
 
 I.
 
 2
 Between 1973 and 1975 five environmental groups (collectively "NRDC") brought four separate lawsuits against EPA to rectify the Agency's alleged failure to implement several provisions of the statute then known as the Federal Water Pollution Control Act (FWPCA). 33 U.S.C. § 1251 et seq. (1976).[5] The first lawsuit challenged the criteria EPA was using to decide which pollutants to include in a list of toxic pollutants the Agency was required to compile by Section 307(a) of the FWPCA, and also sought to expand EPA's then existing list of toxic pollutants (the toxic criteria case).[6] The second and third lawsuits were aimed at compelling EPA to promulgate effluent discharge standards for the substances already on the Agency's list of toxic pollutants (the deadlines cases).[7] The fourth lawsuit sought an order requiring EPA to promulgate pretreatment standards under Section 307(b) of the FWPCA covering approximately 35 industries and a wide variety of pollutants (the pretreatment case).[8]
 
 
 3
 While these lawsuits were pending EPA officials conducted a thorough review of the Agency's strategy for controlling toxic pollutant emissions. They concluded that there was a need to replace the Agency's then existing approach with a new strategy calling for an integrated program for controlling toxic pollutants. Furthermore, EPA officials felt that development of the new approach could provide a basis for resolving the controversies between the environmental groups and the Agency.[9] After the general outlines of the new program were developed EPA and NRDC, joined by four industry intervenors in one of the lawsuits,[10] began settlement negotiations. After tentative agreement was reached between EPA and NRDC a proposed settlement agreement was submitted to the District Court.[11] The District Court held several hearings on the proposed agreement and allowed interested parties to file comments on it. The Companies intervened in the proceedings in the District Court and filed comments vigorously opposing the proposed agreement.[12] After requiring several modifications the District Court approved the settlement agreement, finding it a "just, fair, and equitable resolution of the issues raised." Natural Resources Defense Council, Inc. v. Train, 8 ERC 2120, 2122 (D.D.C.1976).[13] No appeal was taken from the court's order adopting the settlement agreement.
 
 
 4
 The settlement agreement outlined a comprehensive strategy for regulation of toxic pollutant discharges under the FWPCA, including details concerning the timing, scope, and nature of the regulatory programs EPA agreed to initiate. Insofar as is relevant to the instant case, EPA proposed to regulate discharge of toxic pollutants by developing effluent limitations, guidelines, and performance standards for new and existing emission sources, as well pretreatment standards regulating introduction of pollutants into treatment works. These limitations, guidelines, and standards were to cover 21 major industries and 65 specified pollutants or groups of pollutants. In promulgating effluent limitations and guidelines EPA agreed that it would employ technology-based controls such as "best available technology" (BAT) performance standards for existing emission sources, and performance standards reflecting the "best available demonstrated control technology" (BADCT) for new sources.[14] The pretreatment standards EPA undertook to promulgate were to apply to any of the 65 pollutants listed in the Agreement and any other pollutants that proved to be "incompatible" with "publicly owned treatment works" (POTWs).[15] Promulgation of the regulations envisaged by the Agreement was to take place according to a phased schedule running through December 31, 1979 and compliance with the regulations by affected industries was to be achieved by June 30, 1983.[16]
 
 
 5
 Adoption of the industry-by industry, technology-based approach, using statutory authority conferred by various sections of the FWPCA,[17] marked a change in EPA's regulatory strategy. Its previous efforts to control discharge of toxic pollutants had relied on authority conferred by Section 307 of the FWPCA in developing health-based standards on a pollutant-by-pollutant basis.[18] The new strategy offered substantial advantages over the old. First, it allowed EPA to cover far more substances and emission sources than could have been handled under the old approach.[19] Second, it allowed the Agency to develop a single regulatory package which would apply to all of the problem pollutants in the discharge of a particular industry, enabling the industry to predict the entire cost of pollution control.[20] Third, the Agency could allow considerations of cost and technology to enter into its decisionmaking and industry was allowed a longer compliance period.[21] Finally, EPA also expected that the new program would be easier to administer.[22]
 
 
 6
 After the Agreement was adopted by the District Court Congress began a review of the FWPCA and EPA's progress toward implementing its provisions. Committees of both Houses of Congress held hearings at which various difficulties EPA was experiencing under the then existing statutory scheme were discussed and the new regulatory framework and strategy established by the settlement agreement was explored.[23] In testimony before the congressional committees NRDC's representatives emphasized that the Agreement was working well,[24] and EPA's spokesman, while acknowledging that the Agency was having trouble meeting the deadlines set by the Agreement, strongly supported the Agreement.[25] The outcome of these hearings was the enactment in December 1977 of several amendments to the FWPCA which was renamed the Clean Water Act (CWA).[26] We shall discuss the nature and importance of those provisions of the 1977 Amendments that are pertinent to this case later. At this point we simply note that the Companies and NRDC disagree about the effect of the 1977 Amendments on the settlement agreement.[27]
 
 
 7
 Meanwhile, NRDC's monitoring of EPA's implementation of the Agreement's provisions convinced it that the Agency would not meet any of the deadlines for proposing and promulgating regulations.[28] Accordingly, on September 26, 1978 NRDC moved for an order to show cause why EPA should not be held in contempt of the District Court's order approving the settlement agreement.[29] EPA responded on October 20, 1978 with a motion to amend the Agreement to extend the deadlines for promulgating regulations, to allow the Agency additional discretion to exclude certain pollutants and industry categories from regulation, and to extend the deadline for compliance with the guidelines to June 30, 1984.[30] In its accompanying opposition to NRDC's motion EPA explained why it had not been able to meet the original deadlines specified by the Agreement. Also on October 20, 1978 the Companies filed a motion to vacate the settlement agreement, arguing that Congress had intended the 1977 Amendments which produced the CWA to supplant the settlement agreement, that the Agreement was in conflict with the congressional program, and that continuation of the settlement agreement would inevitably involve the court in questions of analytical chemistry.[31] On October 30, 1978 NRDC served detailed interrogatories and requests for documents on EPA. Thereafter, NRDC and EPA began discussions on a possible settlement of the controversy. On November 28, 1978 EPA officials met with representatives of the Companies to announce that a tentative agreement with NRDC had been reached, and to distribute copies of a proposed joint motion to modify the settlement agreement that EPA and NRDC had agreed to. The Companies were given ten days in which to submit written comments on the proposal. NRDC and EPA considered the suggestions made in the Companies' comments and made some changes in the proposed modifications to reflect these suggestions.[32] EPA and NRDC filed their joint motion to modify the settlement agreement on December 15, 1978.[33] At the same time they withdrew all their pleadings relating to the motion for a show cause order.[34] The Companies, however, declined to withdraw their motion to vacate the settlement agreement. By agreement of the parties the Companies were given until January 5, 1979 to file with the court any response or objections to the proposed modifications. The Companies filed a memorandum opposing the motion to modify the Agreement. In addition to repeating their contention that the Agreement must be vacated because it had been superseded by the 1977 Amendments, the Companies raised two new arguments. First, they argued that the Agreement also must be vacated because each of the four cases which underlie the Agreement had been mooted by the Amendments and must be dismissed. Second, they maintained that the proposed modification would violate public notice and comment requirements of the Administrative Procedure Act (APA), the Clean Water Act, EPA regulations, and an Executive Order, as well as constitutional requirements of due process. The District Court heard oral argument on both motions and permitted additional briefs on the new issues raised by the Companies. On March 9, 1979 the District Court issued its order denying the Companies' motion to vacate the settlement agreement and granting NRDC's and EPA's motion to modify the Agreement.
 
 
 8
 In its memorandum opinion accompanying the order the District Court addressed each of the Companies' arguments. First, it rejected the Companies' claim that Congress intended the 1977 Amendments to the FWPCA to supplant the Agreement. The court concluded that neither the terms of the Amendments nor the legislative history support this claim. Instead, it found that Congress intended the Agreement "to remain in effect to supply the missing details of a cohesive strategy for controlling toxic water pollution." Natural Resources Defense Council, Inc. v. Costle, supra, 12 ERC at 1836. Second, the court ruled that two of the four cases that were resolved by the settlement agreement were not moot, and that these two cases provided an adequate basis for continuing the Agreement. Id. at 1837, 1838. Finally, the court dismissed the Companies' statutory and constitutional objections to the modifications to the settlement agreement proposed by NRDC and EPA. The court found that the modifications were not "rules" within the meaning of the APA for which notice and comment were required, and that appellants' constitutional rights to effective notice were not violated because the modifications would have no direct or immediate effect on them. Id. at 1838-1840. These appeals followed.
 
 II.
 
 9
 On appeal the Companies raise essentially the same three arguments that they presented to the District Court. We will examine these arguments separately.
 
 A. The Effect of the 1977 Amendments
 
 10
 Appellants contend that the District Court erred in rejecting their claim that Congress intended the 1977 Amendments to supersede the settlement agreement. Appellants maintain that these Amendments were a direct response to the problems EPA had faced in attempting to implement the provisions of the FWPCA, the same problems that were responsible for the shortcomings in the Agency's fulfillment of its statutory obligations that NRDC's lawsuits were aimed at rectifying. The Companies point out that Congress devoted a significant amount of time to studying these problems.[35] The outcome of this detailed review, appellants contend, was a congressional acknowledgement that EPA's failure to accomplish much in terms of realizing the objectives and goals of the FWPCA was largely a result of deficiencies in both substantive and procedural provisions of the Act. Appellants argue that the toxic pollutant provisions of the 1977 Amendments were designed to replace the unworkable provisions of the FWPCA with a comprehensive and workable statutory framework for regulation of toxic pollutants that would eliminate the need for continued court supervision of the toxic pollutants programs. In particular, Congress abandoned the requirement that EPA develop health-based standards regulating discharge of toxic pollutants on a pollutant-by-pollutant basis, substituting in its place an industry-by-industry, technology-based BAT approach to controlling emission sources. In addition, Congress resolved the controversy over how many pollutants should be included in EPA's list of toxic pollutants by specifying 65 pollutants that had to be included in the list and granting EPA's Administrator authority to add pollutants to or delete them from this list. While acknowledging that these two changes merely adopted the regulatory framework established by the settlement agreement, appellants point to other provisions in the Amendments which they contend show that Congress did more than merely ratify the settlement agreement.[36] In appellants' view, the breadth and detail of these other changes demonstrate that Congress "went beyond mere ratification of the (settlement agreement) and tinkering with its toxics program and instead devised a comprehensive program to control the discharge of toxic pollutants to replace the old section 307(a) and the (Agreement)."[37]
 
 
 11
 Appellants find further support for their view that Congress intended the Amendments to supersede the settlement agreement in the legislative history of the Amendments. In this the Companies largely rely on a statement made by Congressman Roberts while explaining the toxic pollutant provisions of the House-Senate Conference Report to his colleagues. Congressman Roberts said:
 
 
 12
 In summary, the revisions to the toxics regulatory program contained in the conference report * * * simplify the procedures for identifying toxic pollutants and promulgating regulations according to their characteristics. The discretion exercised by the Administrator is broadened, the procedures less formally structured, and burdens of proof modified to the point where the program may proceed in a more rapid and orderly fashion without further recourse to the courts.
 
 
 13
 Crisis-by-crisis reaction to the problem of toxics must no longer be the norm, but must be replaced by an orderly program for adding compounds to the list, with the Administrator fully in charge. It, therefore, would be entirely appropriate for the United States to petition the courts to relinquish jurisdiction over toxic pollutant control under Public Law 92-500, now that the statutory basis has been laid for a workable regulatory program the lack whereof led to the litigation resulting in the consent decree. This is particularly appropriate in view of the large number of potentially toxic chemicals to be addressed by the program and the need for administrative discretion within the revised regulatory framework to carry out the provisions of law enacted herein.
 
 
 14
 This is the intent of this legislation, an outgrowth of House initiatives by the House conferees.
 
 
 15
 123 Cong.Rec. H12927-H12928 (daily ed. Dec. 15, 1977). Appellants maintain that Congressman Roberts' views must be given significant weight, pointing out that he was chairman of the House Subcommittee that drafted the Amendments, chairman of the House conferees, vice-chairman of the House-Senate Conference Committee, and floor manager of the Conference Report in the House. Appellants suggest that Congressman Roberts' statement takes on added significance because the toxic pollutant provisions of the Amendments were drafted by the Conference Committee and the Conference Report is silent on the issue of congressional intent.[38]
 
 
 16
 Claiming to have demonstrated that Congress intended the 1977 Amendments to supplant the settlement agreement, appellants then note that courts have vacated settlement agreements where an intervening Act of Congress has changed the relevant law in such a manner as to eliminate the right which the settlement agreement was designed to safeguard. The Companies find illustrations of the operation of this principle in two Supreme Court cases, System Federation No. 91 v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), and Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855). In Wheeling & Belmont Bridge the Court examined the effect of subsequent legislation on an outstanding injunction. The State of Pennsylvania had earlier obtained an injunction barring the company from constructing or maintaining a bridge across the Ohio River on the ground that the bridge in question obstructed navigation in such a manner as to be in conflict with certain Acts of Congress regulating navigation. A subsequent statute declared the bridge to be a lawful structure in its existing position and elevation. The Supreme Court dissolved the injunction, pointing out that the later Act of Congress had eliminated the public right the injunction had served to protect by resolving the question whether the bridge was an unlawful obstruction. In System Federation the Court relied on Wheeling & Belmont Bridge in holding that a District Court had abused its discretion in refusing to modify a consent decree after an Act of Congress changed the relevant law. The District Court had earlier approved a consent decree resolving litigation brought by non-union employees against a railroad and a number of unions representing its employees. The plaintiffs had charged the defendants with violating Section 2 of the Railway Labor Act which forbade discrimination against non-union employees. As part of the settlement agreement the court enjoined the defendants from discriminating against non-union employees because of their refusal to join a union. After Congress amended the Railway Labor Act to permit contracts requiring union shops the unions petitioned the District Court for a modification of the consent decree to permit negotiation of union shop contracts. The District Court denied the petition and the Sixth Circuit affirmed. In reversing the Supreme Court pointed out that "the District Court's authority to adopt the consent decree comes only from the statute which the decree is intended to enforce" since "(i)t was the Railway Labor Act, and only incidentally the parties, that the District Court served in entering the consent decree." System Federation No. 91 v. Wright, supra, 364 U.S. at 651, 81 S.Ct. at 373. The Court then noted that a "court must be free to continue to further the objectives of (an) Act when its provisions are amended" by "modify(ing) the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives." Id.
 
 
 17
 The Companies argue that since the terms and legislative history of the 1977 Amendments indicate that Congress intended the toxic pollutant provisions of the Amendments to supersede the framework established by the settlement agreement, application of the settled principles announced by the Supreme Court in Wheeling & Belmont Bridge and System Federation requires that the judgment of the District Court in the instant case be reversed and the settlement agreement vacated.
 
 
 18
 The power of a District Court sitting as a court of equity to modify the terms of a settlement agreement it previously adopted cannot be drawn into question. See System Federation No. 91 v. Wright, supra, 364 U.S. at 642-647, 81 S.Ct. at 368; Chrysler Corp. v. United States, 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942); United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). The decision to grant or deny a request to modify the terms of a consent decree rests with the discretion of the District Court. See System Federation No. 91 v. Wright, supra, 364 U.S. at 646-647, 81 S.Ct. at 371; Chrysler Corp. v. United States, supra, 316 U.S. at 562, 62 S.Ct. at 1149. However, sound exercise of judicial discretion may require that terms of a consent decree be modified when there has been a significant change in the circumstances obtaining at the time the consent decree was entered. This change in circumstances may result from a change in controlling law, including changes brought about by subsequent legislation. See, e. g., System Federation No. 91 v. Wright, supra; Pennsylvania v. Wheeling & Belmont Bridge Co., supra; Daylo v. Administrator of Veterans' Affairs, 501 F.2d 811, 816 (D.C.Cir.1974); McGrath v. Potash, 199 F.2d 166, 167-168 (D.C.Cir.1952). Application of these settled principles does not, however, provide a ready answer to the case at bar. One of the issues we must resolve is whether in fact Congress intended the 1977 Amendments to supplant the settlement agreement.
 
 
 19
 Our starting point, of course, is the language and provisions of the Amendments. Clearly, the strongest evidence of a congressional intent to supersede the settlement agreement would be an explicit declaration of such an intention in the language of the Amendments. In the instant case we do not understand appellants to be suggesting that any such declaration of congressional intent appears in the language of the 1977 Amendments. Nor have we found any such statements. The silence of the Amendments on the issue of Congress' intent with regard to the settlement agreement is not necessarily fatal to appellants' claim, however. As the District Court pointed out,[39] if a congressional intent to supplant the Agreement is a "necessary implication" of the provisions of the Amendments, we would have to find that appellants are correct in arguing that the Agreement must be vacated.[40] Alternatively, evidence of congressional intent may be provided by clear statements in the legislative history.
 
 
 20
 After reviewing the changes made in the toxic pollutant provisions of the FWPCA by the 1977 Amendments, as well as the legislative history of the Amendments, we are unable to accept appellants' contention that they show that Congress clearly intended the 1977 Amendments to supersede the settlement agreement. First, this case does not present an instance of the type of situation that confronted the Supreme Court in System Federation and Wheeling & Belmont Bridge -a situation in which there is a clear conflict between the terms of a settlement agreement and the provisions of a subsequent Act of Congress. As appellants concede,[41] the two major substantive changes in the toxic pollutant provisions of the FWPCA that were made by the 1977 Amendments merely ratified the settlement agreement. Both Congress' substitution of an industry-by-industry, technology-based BAT approach for the pollutant-by-pollutant, health-based approach required by Section 307 of the FWPCA, and its decision to specify a list of 65 pollutants-the same pollutants listed in the Agreement-that were to be included in EPA's revised list of toxic pollutants under Section 307(a), amounted to little more than an "attempt to conform the statute to the reality of (the) program" EPA had been developing under the terms of the settlement agreement. Natural Resources Defense Council, Inc. v. Costle, supra, 12 ERC at 1836. See Hercules, Inc. v. EPA, 598 F.2d 91, 101 (D.C.Cir.1978).
 
 
 21
 Only in two relatively minor aspects did the amended statute depart from the framework established by the settlement agreement. First, Section 307(a) of the Act was amended to allow EPA's Administrator to add to or delete from the list of 65 toxic pollutants. Second, the Agreement's deadline for promulgation of BAT regulations was extended to July 1, 1980.[42] These minor departures from the terms of the settlement agreement cannot be interpreted as evidence of a congressional rejection of the Agreement, or as signs of an intention to supersede all its provisions. If instead of endorsing the strategy and framework set out in the settlement agreement the Amendments had required EPA to adopt a different regulatory approach, we might be inclined to agree with the Companies that a congressional intention to supersede the Agreement is a "necessary implication." But as we have already indicated, this is not such a case. Indeed, if any inferences are to be drawn from Congress' actions, it would appear that the District Court's conclusion that "Congress intended for the Agreement to remain in effect to supply the missing details of a cohesive strategy for controlling toxic water pollution"[43] is the more plausible inference.
 
 
 22
 We are also not persuaded by the Companies' claim that the legislative history of the Amendments offers clear evidence of a congressional intent to supplant the settlement agreement. First, we, like the District Court, have some difficulty understanding why if, as appellants maintain, Congress wanted to supplant the Agreement, it did not bother to say so in any of the reports-House, Senate, or Conference-that accompanied the legislation; this in spite of the fact that it also failed to express this intent in the Amendments themselves. The absence of any indications of such congressional intent in the various reports could not have been inadvertent since both House and Senate Committees heard testimony from NRDC and EPA about the terms of the settlement agreement.[44] Moreover, the silence of the committee reports on this issue of congressional intent stands in marked contrast to the clarity with which these reports dealt with other court decisions which Congress chose to supersede. For example, in amending Sections 313 and 404 of the FWPCA to make it clear that the dredging activities of the Army Corps of Engineers are subject to state water quality laws, the Senate Report explained that these amendments were intended to overrule a contrary holding by the Eighth Circuit in Minnesota v. Hoffman, 543 F.2d 1198 (8th Cir. 1976), cert. denied, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977). S.Rep.No.95-370, 95th Cong., 1st Sess. 68 (1977),[45] U.S.Code Cong. & Admin.News 1977, p. 4326.
 
 
 23
 The only real support for their interpretation of congressional intent the Companies have pointed to is the statement by Congressman Roberts quoted above.[46] It is, of course, well established that courts give considerable weight to the views of sponsors and floor managers of legislation in determining congressional intent. See NLRB v. Fruit & Vegetable Packers & Warehousers, Local 760, 377 U.S. 58, 66-67, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 374, 394-395, 71 S.Ct. 745, 750, 95 L.Ed. 1035 (1954); United States v. United Mine Workers of America, 330 U.S. 258, 278-284, 67 S.Ct. 677, 688, 91 L.Ed. 884 (1947). However, not even Congressman Roberts' statement offers such clear support for appellants' claim. Congressman Roberts did not suggest that it was Congress' intention (as he understood it) that the 1977 Amendments would automatically supersede the Agreement. Rather, he merely indicated that inasmuch as Congress had amended the procedural provisions of the FWPCA that were responsible for EPA's difficulties with implementing the statute, EPA should consider "petition(ing) the courts to relinquish jurisdiction over toxic pollutant control * * *."[47] Thus the most that appellants can claim is that Congressman Roberts thought it "entirely appropriate" for EPA to ask the court to relinquish jurisdiction. This is not quite the same as a suggestion that Congressman Roberts believed that the Amendments would automatically supersede the settlement agreement.
 
 
 24
 Moreover, there are other statements in the legislative history of the Amendments, including a statement by Congressman Roberts, which indicate a different view of congressional intent from that suggested by appellants. The Senate Report on the 1977 Amendments had this to say about the regulatory framework established by the settlement agreement:
 
 
 25
 During the course of its hearings the committee examined in detail EPA's proposal and strategy for controlling the discharge of toxic pollutants primarily through the development of effluent guidelines for the best available technology economically achievable under section 301(b)(2)(A) and the subsequent reissuance of permits under section 402 to require the application of such technology by dischargers by July 1, 1983. The Committee approves of and endorses this strategy.
 
 
 26
 S.Rep.No.95-370, supra, at 56, U.S.Code Cong. & Admin.News, 1977, p. 4380 (emphasis added). Similarly, in explaining the reasoning behind the toxic pollutant provisions of the Conference Report to his Senate colleagues Senator Muskie noted:
 
 
 27
 Another, and possibly more important, reason for maintaining the BAT requirements is that the Agency currently has a major program underway of using BAT to control toxics. Technology-based effluent limitations are being developed which will place limits on toxic pollutants which pose or are likely to pose human health and ecological hazards.
 
 
 28
 The conference agreement was specifically designed to codify the so-called "Flannery decision," which set forth 65 families of pollutants which are to be regulated by BAT, and EPA has been implementing this consent decree. To take a different course for dealing with toxics at this point would require a major reprogramming of EPA resources. Such a delay, whether it be to allow utilization of a different section of the act or in order to implement this section, would only cause confusion and add still more delay to efforts to solve the toxics problem. The discharge of toxic pollutants should be eliminated as soon as possible. Because EPA is already embarked upon a program to control toxics using a proven mechanism, technology-based effluent limitations, and because of the urgency to control toxics, prudent public policy demands that the strategy be maintained.
 
 
 29
 123 Cong.Rec. S19647-S19648 (daily ed. Dec. 15, 1977) (emphasis added). Inasmuch as Senator Muskie was chairman of the Senate Subcommittee which reviewed EPA's implementation of the FWPCA, was a member of the House-Senate Conference Committee on the 1977 Amendments, and served as floor manager of the Conference Report in the Senate, his views are entitled to significant weight in fathoming congressional intent.[48] Nothing in Senator Muskie's statement suggests that he viewed the settlement agreement as being superseded by the Amendments. If anything, his statement seems to confirm the District Court's conclusion that Congress intended the settlement agreement to supply the details of the toxics program. Further evidence that Congress intended the settlement agreement to continue in force, subject to modifications to conform it to the amended statute, is provided by a statement made by Senator Randolph in discussing the toxic pollutant provisions of the Conference Report. He stated:
 
 
 30
 In the requirements for the control of toxic pollutants adopted by the conferees, the measure before us largely follows the strategy presently being used by the Environmental Protection Agency under the settlement agreement in the case of Natural Resources Defense Council against Train. That important case required the development of a minimum degree of control for a specified list of pollutants to be achieved on a definite schedule. The principal way in which the conference report modifies the settlement agreement is to require the publication of effluent limitations based on best available technology at a minimum for the listed pollutants by July 1, 1980, and to specify July 1, 1984, as the latest date for compliance with those effluent limitations.
 
 
 31
 123 Cong.Rec. S19663 (daily ed. Dec. 15, 1977) (emphasis added). Senator Randolph was chairman of the Senate Committee that drafted the 1977 Amendments and a member of the House-Senate Conference Committee. Insofar as Senator Randolph viewed the 1977 Amendments as "modifying" the settlement agreement, it is difficult to believe that he understood Congress' intention to be that the Agreement would be completely superseded by the Amendments.
 
 
 32
 Finally, as we have already indicated, a statement by Congressman Roberts suggests that he too assumed that EPA would continue to be bound by the terms of the Agreement. In describing the BAT-toxic pollutants provisions of the Conference Report to the House, Congressman Roberts said the following about the statutory provision authorizing EPA to add to or delete from the list of 65 toxic pollutants specified by the statute:
 
 
 33
 (T)he Administrator, in his discretion, may determine that certain toxic pollutants-or subclasses of pollutants-are not appropriate for regulation in certain circumstances. For example, the Administrator may use his discretion when equal or more effective protection is already provided with respect to that pollutant by an effluent limitation and guideline promulgated pursuant to other sections of the act or, when the discharge of (a) specific pollutant results from its presence in intake water; or, where a specific pollutant is present in either insignificant or trace quantities and does not cause or is not likely to cause toxic effects to identifiable organisms affected by the discharge.
 
 
 34
 123 Cong.Rec. H12927 (daily ed. Dec. 15, 1977).[49] However, Congressman Roberts did not describe decisionmaking criteria contained in the statute. Rather, these decisionmaking criteria are contained in paragraph 8 of the settlement agreement. Section 307(a)(1) merely directs the Administrator to "take into account toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms, and the nature and the extent of the effect of the toxic pollutant on such organisms."[50] Thus Congressman Roberts' statement seems to imply that he too expected that the settlement agreement would continue in force to supply missing details for the toxic pollutants program.[51]
 
 
 35
 These indications in the legislative history of the 1977 Amendments that Congress expected the settlement agreement to continue in effect, and the ambiguity of such evidence as the Companies are able to marshall in support of their interpretation of congressional intent, lead us to conclude that the District Court properly rejected appellants' statutory supersession argument. We therefore turn to the Companies' claim that the Agreement should be vacated because each of the four cases which provided the basis for the Agreement is now moot and must be dismissed.
 
 B. Mootness
 
 36
 Appellants begin their discussion by pointing out that Article III's "case or controversy" requirement prevents federal courts from issuing judgments in cases which are moot. Citing Supreme Court decisions in Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969), and Kremens v. Bartley, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977), appellants further note that a case may become moot if the statute upon which a claim is based is amended in such a fashion that the facts set forth in the complaint do not present a controversy under the new law. Appellants contend that application of these controlling legal precedents to the facts of the instant cases requires vacation of the settlement agreement and dismissal of the four cases which underlie the Agreement. The Companies suggest that both parties agree (and the District Court found) that two of the four cases are moot. In these two cases-the deadlines cases-NRDC had alleged that EPA had violated Section 307(a) of the FWPCA by failing to promulgate final toxic pollutant effluent standards for nine substances within six months of issuing proposed standards as required by the statute. The complaint requested the court to order EPA to promulgate final standards for the nine substances. The Companies note that the 1977 Amendments repealed both the six-month deadline and the requirement that EPA promulgate toxic pollutant effluent standards, replacing these provisions with a requirement that EPA promulgate effluent guidelines for 65 specified pollutants on an industry-by-industry basis by July 1, 1980 and thereby mooting the deadlines cases. Appellants contend that the mootness question in these cases involves the two remaining cases-the toxic criteria case and the pretreatment case.
 
 
 37
 In the toxic criteria case NRDC alleged that EPA had violated the statute in two respects. First, NRDC contended that EPA had used unlawful and restrictive criteria for selecting substances to include in the list of toxic pollutants required by Section 307(a) of the FWPCA. Second, NRDC alleged that because of its use of these impermissible criteria EPA had illegally omitted from the list 25 substances which the Agency would have determined to be toxic pollutants had it used the proper statutory criteria. In the pretreatment case NRDC sought to compel EPA to promulgate pretreatment standards covering over 30 categories of point sources. NRDC alleged that EPA had violated the statute by failing to publish final pretreatment standards for approximately 31 categories of point sources within 90 days of publishing proposed standards as required by the Act, and it noted that proposed standards for 14 of these categories had been pending for more than one year.
 
 
 38
 Appellants argue that NRDC's claim in the toxic criteria case was based on language in the old Section 307 which was repealed by the 1977 Amendments, noting that the new Section 307(a) only requires EPA to publish a list of 65 specified toxic pollutants, which EPA has done, and further provides that EPA "may revise (this) list" by adding pollutants to or deleting them from it. Appellants maintain that the 1973 EPA decisions at issue in the toxic criteria case are irrelevant to the Agency's implementation of the new statutory provisions. Appellants further argue that resolution of the issues raised in the toxic criteria case would amount to the court's rendering an advisory opinion because the decision would not alter either the existing Section 307(a) list or the manner in which EPA has and will implement the new statutory provisions. The Companies then turn to the District Court's finding that the toxic criteria case is not moot because "(t)o date, EPA has not renounced the alleged arbitrary and unauthorized criteria it used (to compile the list of toxic pollutants under the old Section 307(a) in 1973), nor has it published revised selection criteria." Natural Resources Defense Council, Inc. v. Costle, supra, 12 ERC at 1837.[52] The Companies maintain that the District Court failed to realize that the 1973 criteria have been effectively repealed by EPA and have been made irrelevant by the 1977 Amendments.[53] The Companies add that when EPA published the list of toxic pollutants in January 1978 as directed by the 1977 Amendments, it omitted any mention of the 1973 criteria in discussing its authority to revise the Section 307 list. Finally, the Companies suggest that events transpiring after the District Court's decision demonstrate that the 1973 criteria are irrelevant and will no longer be applied by EPA. Appellants first note that on March 27, 1979 EPA published a document entitled "Guidance on Factors to be Addressed in Petitions to Revise" the Section 307(a) toxic pollutant list. 44 Fed.Reg. 18279 (March 27, 1979). Appellants maintain that the list of factors contained in this document effectively repealed the 1973 criteria. Second, appellants maintain that in denying two petitions by Dow Chemical Company to remove two substances from the Section 307 list the Agency made no mention of the 1973 criteria, thereby confirming that the March 27, 1979 publication effectively repealed the 1973 criteria.
 
 
 39
 The Companies' contention that the fourth case-the pretreatment case-is moot is based on their interpretation of the provisions of the settlement agreement. They contend that to settle the pretreatment case EPA and NRDC agreed to paragraph 13 of the settlement agreement pursuant to which EPA undertook to promulgate pretreatment standards covering eight industry categories by May 15, 1977. Appellants point out that EPA has issued regulations establishing pretreatment standards for the eight industrial categories listed in paragraph 13, and they argue that EPA's fulfillment of its obligations has extinguished the controversy between the parties and rendered the pretreatment case moot.
 
 
 40
 Finally, appellants contend that even if the District Court was correct in finding that the pretreatment and toxic criteria cases are not moot, it still erred by refusing to vacate the Agreement. According to the Companies, the proper procedure to be followed when a court discovers that some of the cases which underlie a settlement agreement have become moot is to vacate the agreement and rehear the remaining cases to determine what, if any, relief is appropriate in light of the issues which remain live controversies. Appellants maintain that this procedure is necessary to avoid adjudication of moot issues, and is mandated by constitutional limitations on the court's power as well as by the Supreme Court's decision in Duke Power Co. v. Greenwood County, 299 U.S. 259, 57 S.Ct. 202, 81 L.Ed. 178 (1936). In that case an action was brought by a utility to restrain the County from constructing a power plant and from making contracts for that purpose. The Federal Emergency Administrator for Public Works intervened in the case, revealing that the federal government had entered into a contract with the County to loan it money for the project. The utility challenged the constitutionality of the loan and was upheld by the District Court which entered a final decree enjoining the contract. While the appeal was pending the County and the Administrator terminated the first contract and substituted a new contract which they claimed did not contain the objectionable provisions of the old one. The Court of Appeals remanded the case to the District Court for reconsideration in light of the new contract. Although the pleadings in the District Court were not amended and the court's term had expired, the District Court nevertheless heard evidence regarding the new contract.
 
 
 41
 On appeal the Supreme Court ruled that the first decree should have been vacated so as to revest the court with jurisdiction over the case. The Court pointed out that "(w)here it appears upon appeal that (a) controversy has become entirely moot, it is the duty of the appellate court to set aside the decree below and to remand the cause with directions to dismiss. * * * If it appears that supervening facts require a retrial in the light of a changed situation, the appropriate action of the appellate court is to vacate the decree which has been entered and revest the court below with jurisdiction of the cause to the end that the issues may be properly framed and the retrial had." Id. at 267-268, 57 S.Ct. at 205 (citations omitted).
 
 
 42
 Appellants contend that Duke Power requires a trial court to vacate a settlement agreement to the extent that it is based on mooted issues, arguing that the court has no power to modify such an agreement without making a preliminary determination that the issues, if any, in the remaining "live" controversies will support the modified decree. Appellants claim that the District Court refused to make such a determination in this case.[54] The Companies further argue that as a factual matter the pretreatment and toxic criteria cases do not provide an adequate basis for continuing the settlement agreement. In their view, the remaining controversies in these two cases, assuming that there are some, cannot support even the original settlement agreement, let alone the modifications approved by the District Court.[55]
 
 
 43
 Addressing first the Companies' claim that both the pretreatment and toxic criteria cases are moot, we agree with the District Court that these two cases remain live controversies. With respect to the pretreatment case, we are unable to agree with the Companies' suggestion that EPA's compliance with the requirements of paragraph 13 of the settlement agreement has fulfilled all its obligations relating to that case and therefore eliminated the controversy between NRDC and EPA. NRDC's complaint in the pretreatment case alleged violations and requested relief pertaining to "all pollutants which are determined not to be susceptible to treatment by (publicly owned treatment works) or which would interfere with the operation of such works."[56] In addition, the complaint specifically listed over 30 categories of point sources for which EPA was required to promulgate pretreatment standards.[57] Paragraph 13 of the settlement agreement, on the other hand, merely required EPA to promulgate pretreatment standards covering eight industries.[58] Given the very broad scope of relief requested by NRDC's complaint in the pretreatment case and the relatively narrow reach of paragraph 13, it is difficult to accept the Companies' claim that NRDC exchanged its pretreatment case for the provisions in paragraph 13. Moreover, the Companies' suggestion that this is the deal that was struck is unsupported by any evidence other than appellants' bald allegation that this is what happened. As the District Court pointed out,[59] other paragraphs of the settlement agreement outline other actions relating to pretreatment standards that EPA agreed to undertake and which it has not yet done.[60] Thus even if we were to accept the Companies' implicit assumption that only those provisions in the Agreement which deal with pretreatment standards were exchanged for NRDC's agreement not to prosecute the pretreatment case, we would still reject the suggestion that the case is moot. Finally, inasmuch as the settlement agreement was "a comprehensive interrelated package,"[61] it is reasonable to assume that other provisions of the Agreement, such as the BAT limitations and guidelines, were also part of the quid pro quo NRDC received in return for agreeing not to litigate the pretreatment case.
 
 
 44
 As for the toxic criteria case, it should first be noted that appellants are simply wrong in suggesting that NRDC's claim in that case was based on language in the FWPCA which was repealed by the 1977 Amendments. In fact, the disagreement between NRDC and EPA revolved around the latter's interpretation of the statutory criteria for making listing decisions. The 1977 Amendments did not change these criteria in any way. While appellants may be correct in suggesting that the Amendments changed what may have been the Administrator's mandatory duty to list pollutants into a discretionary duty by explicitly leaving the decision to add to, or delete from, the list specified by Congress to his discretion, the nature of the Administrator's duty was not central to the controversy between NRDC and EPA. In making the now discretionary listing decisions the Administrator must still use the proper statutory decisionmaking criteria. If in fact EPA has continued to use the 1973 criteria (which NRDC alleges violate the statute), or at the very least has not renounced these criteria, we can hardly conclude that the toxic criteria case is moot. Thus appellants' contention that the case is moot must ultimately rest on their claim that EPA has abandoned the 1973 criteria.
 
 
 45
 We agree with the District Court that there is no clear evidence indicating that EPA has abandoned the 1973 criteria. Even the EPA publications on which the Companies rely in arguing that EPA has abandoned the 1973 criteria demonstrate that this claim is inaccurate. As NRDC points out, one of the factors listed in these EPA publications as having been considered by the Agency is a pollutant's usual or potential presence in water,[62] a factor which, NRDC maintains, the statute does not permit the Agency to consider and one of the allegedly illegal criteria mentioned in NRDC's complaint in the toxic criteria case.[63] We therefore conclude that the District Court correctly found that the toxic criteria case is not moot because there is no clear indication that EPA has abandoned the 1973 criteria.
 
 
 46
 Having determined that the toxic criteria and pretreatment cases are not moot, it remains for us to consider appellants' contention that the proper procedure for the District Court to follow in these circumstances was to vacate the settlement agreement and rehear the two remaining cases. Appellants have not pointed to any cases that have addressed this precise issue of the procedure to follow when some of the cases underlying a settlement become moot. However, courts have on numerous occasions dealt with the question whether a change in circumstances which moots some of the issues in a particular case thereby eliminates the court's jurisdiction over the entire case. The usual practice in such situations is for the court to determine whether any remaining controversies in the case provide an adequate basis for continued jurisdiction. An illustration of this is the Supreme Court's decision in Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). There, Representative Powell had been denied his seat in the House by the 90th Congress, but by the time the case was heard in the Supreme Court he had been reelected and seated by the 91st Congress. Without determining whether his claims for more specific relief had become moot, the Court ruled that his claim for damages on account of past salary required disposition of the merits of the case. The Court pointed out that "(w)here one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." Id. at 497, 89 S.Ct. at 1951.[64]
 
 
 47
 This disposition of partially moot cases suggests that even under appellants' mootness theory a court continues to have jurisdiction over a settlement agreement where some of the cases that underlie the agreement remain live controversies. Thus the District Court had jurisdiction over the Agreement because the pretreatment and toxic criteria cases had not become moot. While it may become necessary to modify the terms of a settlement agreement because some of the cases which provided the basis for it have become moot, we do not agree with appellants' suggestion that the court must first vacate the settlement agreement and rehear the remaining live cases. Nothing in System Federation No. 91 v. Wright, supra, suggests that this is the required procedure.[65] And as we have previously indicated, the decision whether to modify a settlement agreement in light of changed circumstances is ordinarily left to the discretion of the District Court. As the Supreme Court noted in System Federation No. 91 v. Wright, supra, "A balance must * * * be struck between the policies of res judicata and the right of the court to apply modified measures to changed circumstances. Where there is such a balance of imponderables there must be wide discretion in the District Court." 324 U.S. at 647-648, 81 S.Ct. at 371. We are of the view that the procedure to follow in circumstances such as those presented by this case is also best left to the discretion of the District Court. Where it deems it appropriate the court may choose to vacate the settlement and rehear the remaining live controversies. Alternatively, the court may simply decide whether modification of the agreement is necessary or appropriate.
 
 
 48
 Nothing in the Supreme court's decision in the Duke Power case suggests a different rule. Duke Power involved a situation in which the action of the defendants in terminating the contract that had been at issue in the first proceeding before the District Court completely eliminated the controversy in that case. As such the court no longer had jurisdiction over the case. In order to vest the court with jurisdiction over the new controversy created by the existence of the new contract executed by the County and the federal government, the District Court's decree in the first case had to be vacated and the parties allowed to amend their pleadings in light of the new factual and legal issues that were raised by the second contract. Duke Power has been uniformly interpreted as indicating the procedure to be followed by an appellate court asked to review a decision which has been mooted by events that transpired after the lower court's decision was rendered. See, e. g., United States v. Munsingwear, 340 U.S. 36, 39-40, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950); Giumarra Vineyards Corp. v. Farrell, 431 F.2d 923, 925 (9th Cir. 1970); Knapp v. Baker, 509 F.2d 922 (5th Cir. 1975); Narragansett Improvement Co. v. Local Union No. 251, 506 F.2d 715 (1st Cir. 1974); Welch v. Simon, 498 F.2d 1060, 1062 (D.C.Cir.1974). As the Supreme Court explained, "Where it appears upon appeal that (a) controversy has become entirely moot, it is the duty of the appellate court to set aside the decree below and to remand the cause with directions to dismiss." Duke Power Co. v. Greenwood County, supra, 299 U.S. at 267, 57 S.Ct. at 205. Thus Duke Power does not purport to prescribe a rule to govern situations such as the one in the instant case.
 
 
 49
 All we need decide in this case, then, is whether the District Court abused its discretion by refusing to follow the procedure suggested by the Companies. As a preliminary matter, it should be noted that the Companies do not appear to have urged this procedure on the District Court with as much vigor as they press it on appeal.[66] In these circumstances it is hardly surprising that the court declined to follow this procedure. Be that as it may, the District Court noted that the "Agreement represents a comprehensive, interrelated package of concessions made by EPA in return for plaintiffs' agreement not to pursue the claims raised in the four lawsuits." Natural Resources Defense Council, Inc. v. Costle, supra, 12 ERC at 1838. It further noted that "it cannot be said that each portion of the Agreement is specifically responsive to a particular claim contained in one or more of the original complaints." Id. Finally, the court pointed out that "the (Companies) nowhere have suggested that the two causes of action as to which controversies still survive would not alone have provided a substantial basis for the settlement approved by the court in 1976." Id.[67] Plainly, the District Court found that these cases do in fact provide an adequate basis for continuing the Agreement. In these circumstances we do not believe that the court abused its discretion by refusing to follow the procedure suggested by the Companies. The court's conclusion that the two non-moot cases provided an adequate basis for continuing the Agreement obviated any need to vacate the Agreement and rehear the cases.
 
 
 50
 Nor do we think that the District Court was required to make a further determination that the toxic criteria and pretreatment cases could provide an adequate basis for the modifications to the settlement agreement that it approved. Even assuming that the Companies are correct in claiming that the modified settlement agreement "places substantial new burdens and obligations * * * upon EPA,"[68] a claim we will examine in due course, we do not agree that the District Court had to find that these "new burdens" could be supported by the two non-moot cases. The modifications to the settlement agreement were designed to resolve a new controversy that had arisen over EPA's non-compliance with the court's 1976 order approving the Agreement. There can be no question that the District Court had the power to enforce the provisions of a settlement agreement it had approved by requiring further action from the offending party.
 
 
 51
 C. Modifications to the Settlement Agreement
 
 
 52
 In contending that EPA contravened public notice and comment requirements of the APA, the Clean Water Act, EPA regulations, an Executive Order, and due process rights guaranteed by the Fifth Amendment in proposing the modifications to the settlement agreement, the Companies focus on two changes made by the modifications. The first is a new paragraph 4(c) which modifies paragraph 4 of the original settlement agreement. Paragraph 4 had required EPA to develop pretreatment standards for any of the 65 pollutants listed in the Agreement which are not susceptible to treatment by, or are otherwise incompatible with, publicly owned treatment works. In addition, EPA was required to promulgate, by December 31, 1979, pretreatment standards for all other incompatible pollutants present in the emissions from any of the 21 industries covered by the Agreement.[69] New paragraph 4(c) requires EPA to initiate a program "to identify and study" pollutants (other than the 65 explicitly covered by the Agreement) which are incompatible with POTWs, and it specifies certain investigatory steps that the Agency is to follow.[70] Second, the Companies focus on the modifications to paragraph 12 of the 1976 Agreement. That provision had required EPA to set up an investigatory program to determine when and if effluent limitations more stringent than the technology-based limitations mandated by the Agreement are necessary to protect human health or aquatic life.[71] EPA agreed to establish "a specific and substantial program"[72] for this purpose by June 30, 1978, and to develop such more stringent limitations whenever the Administrator determined that they were necessary.[73] The modifications to paragraph 12 specify that this program should include processes for identifying seriously contaminated navigable waters and pollutants for which more stringent limitations are necessary, and a process for developing the necessary strategies for limiting discharge of these toxic pollutants.[74] The modifications also set deadlines for EPA to develop and announce these strategies.[75]
 
 
 53
 The Companies and EPA disagree in their characterization of the changes made by these modifications. EPA argues that they provide some fine-tuning of the Agreement, incorporating lessons the Agency has learned in over two years of implementing the Agreement and allowing it greater flexibility and additional time to focus on major environmental problems. In particular, EPA contends that paragraph 4(c) actually increases its rulemaking discretion under the Agreement while merely committing it to specific preliminary investigative action,[76] and that the changes made in paragraph 12 do not reduce the Agency's discretion.[77] The Companies, on the other hand, maintain that these new provisions require EPA to undertake a new series of programs leading to further regulations that go beyond those mandated by the original Agreement and the requirements of the 1977 Amendments. They argue that these modifications mandate that "EPA undertake specified steps and puts EPA in a straightjacket (sic ) where, by contrast, Congress had left the Agency's discretion unfettered."[78] The Companies further argue that, because the modifications place substantial new burdens and obligations on EPA and the industries it regulates, the Agency is required to provide notice and opportunity for public comment prior to taking action of the sort it took in proposing these modifications.
 
 
 54
 In developing this argument the Companies first contend that EPA violated the notice and comment requirements of the APA's rulemaking provisions.[79] Noting that the APA defines a rule as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency,"[80] appellants argue that the modified settlement agreement amounts to a rule since "it has future effect and is designed to mandate programs leading ultimately to regulations and regulatory action * * *."[81] Appellants point out that this court indicated in Pacific Gas & Electric Co. v. FPC, 506 F.2d 33, 37 (D.C.Cir.1974), that the APA's definition of a rule "could be read literally to encompass virtually any utterance by an agency," and that Congress limited the breadth of this definition by excepting certain specified categories of agency activity. Appellants reason from this that unless the modifications can fit within one of these exceptions they must fall within the statutory definition of a rule to which the notice and comment provisions apply, and they argue that none of these exceptions applies to the modifications.
 
 
 55
 First, appellants contend that the modifications do not fall within the statutory exemption for "general statements of policy"[82] because they substantially affect the rights of various members of the public by specifying the manner in which EPA will carry out regulatory programs and take administrative actions under the Clean Water Act.[83] Appellants point out that this court ruled in Pickus v. United States Board of Parole, 507 F.2d 1107 (D.C.Cir.1974), that agency decisions that have substantial effects on rights are not general policy statements, and they argue that Pickus is a persuasive precedent for this appeal. Second, appellants maintain that the modifications cannot be said to constitute an "interpretative rule" exempt from APA notice and comment requirements. The Companies note that the court indicated in Pickus that this exception applies to "administrative construction of a statutory provision on a question of law reviewable in the courts * * *." Id. at 1113. Third, the Companies contend that the modifications are not exempt as a "rule of agency organization, procedure, or practice" which was described in Pickus as applying to "technical regulation of the form of agency action and proceedings." Id. Finally, appellants argue that the last statutory exemption-"for good cause"-also does not apply to the modifications. The Companies conclude, therefore, that the modifications to the settlement agreement fit within the statutory definition of a rule since none of the exceptions apply to them.[84]
 
 
 56
 Appellants next argue that by adopting the modifications EPA contravened public participation requirements of the Clean Water Act and its own regulations. The Companies note that the Act's public participation provision states in pertinent part:
 
 
 57
 Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator * * * under this chapter shall be provided for, encouraged, and assisted by the Administrator * * *.
 
 
 58
 33 U.S.C. § 1251(e) (Supp. II 1978) (appellants' emphasis). Arguing that the terms "plan" and "program" precisely characterize the modifications to the Agreement, appellants contend that it would be a distortion of the plain meaning of the statutory provision if it is not applied to the modifications. Appellants further note that EPA's implementing regulations call for public notice and participation prior to and during the decisionmaking process,[85] and that this public notice concept is well established in other "public policy" cases comparable to this one. Appellants cite as examples the practice of the Department of Justice (now required by statute) of soliciting comments on proposed consent decrees in antitrust cases and other civil actions. Pointing out that they were given only 10 days in which to submit comments on the proposed modifications and this only after EPA and NRDC had agreed to them,[86] appellants argue that EPA's actions in connection with the modifications not only failed to comply with the APA or the Clean Water Act, but also contravened the Agency's regulations as well as the policies established by Congress and the Department of Justice in providing for public notice and comment in comparable cases of public concern.[87]
 
 
 59
 Appellants' final challenge to the modification of the settlement agreement is a constitutional one. They maintain that implementation of the provisions of the modified settlement agreement without public comment would violate requirements of constitutional due process. Appellants contend that if EPA had established the program contained in the modifications outside the context of a judicial proceeding it would have been required to comply with the notice and comment provisions detailed above and, in addition, provide a statement of its determinations along with appropriate factual support in an administrative record. Noting that courts have insisted on effective prior notice to parties affected by consent decrees even when dealing with agreements entered into by private parties,[88] appellants argue that due process requires that similar notice be given to the public before EPA proposed the modifications to the settlement agreement.
 
 
 60
 We do not find it necessary to resolve the disagreement between EPA and the Companies over the proper characterization of the changes made by the modifications to the settlement agreement in order to evaluate the merits of appellants' notice and comment challenges to the modifications. This disagreement really pertains to a separate objection to the modified settlement agreement which we will examine later.[89] For the moment, we simply assume the Companies are correct in claiming that the modifications impose fairly substantial obligations on the Agency.[90] We do not agree with the Companies' contention that the modifications are "rules" within the meaning of the APA for which EPA was required to comply with the statute's notice and comment provisions. All paragraphs 4(c) and 12 of the modified settlement agreement require EPA to do is initiate preliminary investigations as a first step toward determining whether or not to promulgate regulations. The Companies have not cited a single case in which a court has held that action as preliminary to the regulatory process as this constitutes rulemaking for which notice and comment are required. To the contrary, the few courts that have addressed similar notice and comment challenges to agency actions analogous to that in this case have ruled that such actions do not constitute rulemaking. In Appeal of FTC Line of Business Report Litigation, 595 F.2d 685 (D.C.Cir.1978), this court rejected a suggestion that the FTC was required to observe APA notice and comment procedures when exercising its statutory authority to require certain companies to submit data it needed for an investigatory program. The companies had argued that, since the data would be used for regulatory purposes, the collection of data itself was also a prescription of law or policy within the meaning of the APA's definition of a "rule." In dismissing this argument the court noted that "(i)f the collection of information is considered a prescription of law and policy because of the possible regulatory uses to which the information may be put, then all types of compulsory process the product of which may be put to regulatory use-including subpoenas-would similarly require rulemaking." Id. at 695 n.48. See also United States v. W. H. Hodges & Co., 533 F.2d 276 (5th Cir. 1976); Montship Lines, Ltd. v. Federal Maritime Board, 295 F.2d 147 (D.C.Cir.1961). The key point recognized by these cases is that agency investigatory activities preliminary to promulgating regulations are not subject to APA notice and comment requirements. Unlike the situation in FTC Line of Business Report Litigation, the Agency's action in this case will have no immediate or direct effect on the Companies or the general public; neither the modifications themselves, nor the investigatory program they establish, require any action on the part of the public or the Companies.[91] If and when EPA decides to promulgate regulations after completing its investigations, the Companies and the general public will have ample opportunity to participate in the rulemaking process. Any objections the Companies have to the Agency's investigatory program can be raised at that time.
 
 
 61
 The Companies' claim that the modifications "substantially affect( ) the rights of various members of the public, including Appellants,"[92] appears to be based on their belief that if EPA had adopted the investigatory programs specified by the modifications outside the context of a judicial proceeding it would have been required to comply with APA notice and comment procedures. It is difficult to believe that the Companies intend this as a serious argument. EPA has no legal obligation to inform the public of its investigatory activities, much less an obligation to provide an opportunity for comment on such activities. Under the Clean Water Act and various other statutes the Agency is constantly making determinations concerning how it will gather information for future rulemaking, which pollutants or industries should be given special attention, and how limited Agency resources are to be allocated. Were we to accept the Companies' suggestion, EPA would be required to allow notice and comment before making any of these decisions. This suggestion is untenable.[93]
 
 
 62
 Nor do we believe that the modifications necessarily exclude the Companies or any other members of the public from participating in the investigatory programs that EPA agreed to initiate. The Agency is free to request the Companies' participation in collecting and evaluating data pursuant to these investigatory programs, although it is not required to do so. Indeed, in Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692 (D.C.Cir.1975), this court observed that EPA's practice in developing effluent limitation guidelines has been to solicit comments on the preliminary findings of its investigatory programs before publishing proposed regulations. Id. at 712-713 n.105. We have no reason to expect that the Agency will depart from this sound practice. Moreover, under the terms of the settlement agreement the Companies are entitled to receive from APA quarterly briefings on the Agency's progress toward implementing the Agreement. The Companies can raise any problems they may have about the procedures the modifications require at these meetings.
 
 
 63
 Finally, we do not believe that this court's decision in the Pickus case offers any support for appellants' position. Pickus involved the question whether a parole board was required to comply with APA notice and comment requirements before adopting a list of guidelines to govern its parole decisions. The guidelines established specific factors that would be considered by the board in making parole decisions and the weight that would be given to each of the factors. Thus, unlike the instant case, Pickus did not involve a situation in which the agency had merely agreed to undertake preliminary investigations designed to help it decide whether or not it should issue regulations. The guidelines had an immediate and direct effect on applicants for parole inasmuch as they determined whether or not the requests would be granted. The parallel to the situation in the instant case would be if the parole board in Pickus had agreed to employ certain procedures in conducting a study to determine whether guidelines should be promulgated.[94]
 
 
 64
 We also do not agree with the Companies' contention that EPA contravened public participation requirements of the Clean Water Act and its own regulations in proposing the modifications. It should be noted that the Companies' claim that the modifications are "plans" and "programs" within the meaning of the CWA's public participation provisions rests exclusively on their assertion that this is the case. However, EPA has published interpretative regulations which define the precise scope of the "plans" and "programs" covered by the CWA's public participation provisions. These regulations were issued pursuant to the statutory requirement that "(t)he Administrator * * * develop and publish regulations specifying minimum guidelines for public participation * * *."[95] The regulations make it clear that CWA's "plans" and "programs" refer to those that are supported by EPA financial assistance and not to Agency investigatory activities of the sort envisaged by the modifications to the settlement agreement.[96] EPA's interpretation of the statute is reasonable, and it is well established that an agency's interpretation of the statutes it is charged with administering is entitled to considerable deference from the courts. See E. I. DuPont de Nemours & Co. v. Train, 430 U.S. 112, 134-135, 97 S.Ct. 965, 978, 51 L.Ed.2d 204 (1977); Union Electric Co. v. EPA, 427 U.S. 246, 256, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976); Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975); Hercules, Inc. v. EPA, supra, 598 F.2d at 101; Ethyl Corp. v. EPA, 541 F.2d 1, 12 n.16 (D.C.Cir.) (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Deference to the agency's interpretation is particularly appropriate where, as here, the statute specifically requires the agency to develop implementing regulations.[97] Accordingly, we find no basis for appellants' contention that EPA contravened public participation requirements of the Clean Water Act and its own regulations.
 
 
 65
 Finally, we perceive little merit in appellants' claim that EPA's action in agreeing to the modifications deprived them of constitutional due process rights to effective notice. To be sure, appellants may have an "interest" in the results of EPA's investigations. However, this alone does not establish a constitutional entitlement to "effective notice" from EPA prior to proposing the modifications. As we have already indicated, the Companies have not shown that the investigatory program envisaged by the modifications will have an immediate and direct effect on their activities. If after completing its investigation EPA decides to promulgate regulations-and it is these regulations that will impose any requirements on the Companies-appellants will have ample opportunity to participate in rulemaking proceedings. This is all that is required to safeguard any due process rights appellants may have. Moreover, even assuming arguendo that the Companies were entitled to notice, we are not persuaded that they were not given adequate opportunity to comment on the modifications. EPA distributed copies of the proposed modifications to the Companies on November 28, 1978 and allowed them ten days in which to file comments on the proposals, which they did. The proposed joint modification was not submitted to the District Court until December 15, 1978, and pursuant to a schedule approved by the parties the Companies had until January 5, 1979 to file comments on the proposed modifications. Rather than commenting on the proposals, the Companies chose to concentrate their attention on their argument that the settlement agreement should be vacated. In these circumstances, we believe that the Companies were allowed adequate opportunity to comment on the proposed modifications, and thus we cannot agree with their claim that they were denied effective notice.[98]
 
 
 66
 D. Restrictions on the Administrator's Discretion
 
 
 67
 During oral argument in these cases we directed the parties' attention to an issue that was not discussed in the briefs,[99] and which apparently was not raised before the District Court either at the time the original settlement agreement was adopted or at the time of the modifications. Briefly stated, the issue concerns whether the modified settlement agreement impermissibly infringes on the discretion Congress committed to the Administrator to make certain decisions under the CWA by binding EPA to follow certain procedures and use certain decisionmaking criteria not mandated by the statute. After oral argument NRDC filed a Suggestion for Post-Argument Briefs in which it proposed that the parties be allowed to file supplemental briefs addressing two questions:
 
 
 68
 (a) whether it is ever within the authority of a district court to enter and enforce a consent judgment which restricts the discretion an agency might otherwise have in selecting the means by which it will meet its mandatory responsibilities under a general framework statute; and
 
 
 69
 (b) whether in fact that is what the district court has done in these cases. ([100]
 
 
 70
 We granted NRDC's suggestion and directed the parties to file supplemental briefs.
 
 
 71
 After reviewing these supplemental briefs we conclude that the issue of whether the modified agreement impermissibly infringes on the Administrator's discretion should be presented in the first instance to the District Court. First, because the question was not raised below the District Court has not had an opportunity to rule on this issue or to consider its implications in fashioning the decree. Second, there has been no opportunity for the parties to develop a record that will enable us to make the preliminary determination of just what restrictions the modified agreement purports to place on the Administrator's discretion. In its present posture the record of these cases does not contain any of the facts that are necessary to ascertain the true effect of the Agreement on the Administrator's present or future actions. EPA, for example, seems to attach no particular significance to the fact that the Agreement is embodied in a court order, arguing that the conditions in the Agreement are ones the Administrator could have voluntarily imposed upon himself in the normal course of agency decisionmaking, and that the only critical issue in these cases is whether the modifications required the Agency to undertake rulemaking. It is not clear whether EPA means to suggest by this that it considers itself bound to follow the procedures and decisionmaking criteria set out in the Agreement only for as long as the Administrator deems them appropriate.[101] Third, EPA points out that a decision on the first question posed in NRDC's Suggestion may have far-reaching implications affecting other federal departments and agencies, and that a complete exposition of the government's views therefore requires consultations with other agencies and the Department of Justice.[102] We agree that a decision on this issue, should it prove to be necessary, must be made on the basis of a record more fully developed than the one presently available to us. Moreover, EPA should be allowed an opportunity to consult with other agencies that may be affected by a decision on this important issue before being required to take a position. Remand to the District Court will allow these consultations to take place and the court's decision will be informed by the government's considered position on the matter.
 
 III.
 
 72
 Although we agree with the District Court's decision insofar as it rejected the Companies' challenges to the modified settlement agreement, we conclude that these cases must be remanded to the District Court for consideration of the question whether the modified settlement agreement impermissibly infringes on the discretion Congress committed to the Administrator to make certain decisions under the statute.
 
 
 73
 Affirmed and remanded.
 
 
 
 *
 Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1976)
 
 
 [1]
 The companies are Union Carbide Corp., FMC Corp., Dow Chemical Co., E. I. DuPont de Nemours & Co., Celanese Co., Olin Corp., Monsanto Corp., Exxon Corp., Shell Oil Co., Firestone Tire & Rubber Co., and B. F. Goodrich Co
 
 
 [2]
 The American Iron and Steel Institute
 
 
 [3]
 Natural Resources Defense Council, Inc. v. Train, 8 ERC 2120 (D.D.C.1976)
 
 
 [4]
 The environmental groups are the Natural Resources Defense Council, Inc., Environmental Defense Fund, Inc., National Audubon Society, Inc., Citizens for a Better Environment, Inc., and Business and Professional People for the Public Interest, Inc
 
 
 [5]
 The Federal Water Pollution Control Act was enacted in 1972. Pub.L. No. 92-500. As amended in 1977 the statute is now referred to as the Clean Water Act. Pub.L. No. 95-217
 
 
 [6]
 Natural Resources Defense Council, Inc. v. Train, Civil Action No. 2153-73 (D.D.C.), Section 307(a) of the FWPCA then provided in pertinent part:
 The Administrator shall, within ninety days after October 18, 1972, publish (and from time to time thereafter revise) a list which includes any toxic pollutant or combination of such pollutants for which an effluent standard (which may include a prohibition of the discharge of such pollutants or combination of such pollutants) will be established under this section.
 33 U.S.C. § 1317(a)(1) (1976). At the time EPA's list included only nine substances and NRDC's complaint listed 25 other compounds it wanted included in the list.
 
 
 [7]
 Environmental Defense Fund, Inc. v. Train, Civil Action No. 75-0172 (D.D.C.), and Citizens for a Better Environment, Inc. v. Twin, Civil Action No. 75-1698 (D.D.C.). Under the statutory scheme EPA was required to promulgate final effluent standards for the listed substances within one year of listing them. 33 U.S.C. § 1317(a)(2) (1976). EPA had published proposed standards for the pollutants on its list but decided not to issue final standards when comments on the proposed standards revealed major flaws in the Agency's analysis. See R. Hall, The Evolution and Implementation of EPA's Regulatory Program to Control the Discharge of Toxic Pollutants, 10 Nat.Res.Law 507, 514-515 (1977)
 
 
 [8]
 Natural Resources Defense Council, Inc. v. Agee, Civil Action No. 75-1267 (D.D.C.). Under § 307(b) of the FWPCA, EPA was required to publish within nine months of October 18, 1972 "proposed regulations establishing pretreatment standards for introduction of pollutants into treatment works * * * which are publicly owned for those pollutants which are determined not to be susceptible to treatment by * * * or which would interfere with the operation of such treatment works." 33 U.S.C. § 1317(b)(1) (1976). Final pretreatment standards were to be promulgated within 90 days of publishing proposed standards. Id
 
 
 [9]
 See R. Hall, supra note 7, at 515-519
 
 
 [10]
 The American Iron and Steel Institute, the American Petroleum Institute and member companies, the National Coal Association, and American Cyanamid Company intervened in Environmental Defense Fund, Inc. v. Train, supra note 7, shortly after the lawsuit was brought
 
 
 [11]
 EPA briefed the staffs of the Office of Management and Budget, the Water Resources Subcommittee of the House Public Works Committee, and the Environmental Pollution Subcommittee of the Senate Public Works Committee about these negotiations. See R. Hall, supra note 7, at 519
 
 
 [12]
 In all, comments and objections to the proposed settlement agreement were filed by 20 major industries and trade associations. Id
 
 
 [13]
 The Agreement was signed by EPA, the five environmental groups, and the National Coal Association, and was incorporated by reference in a consent decree signed by the District Court
 
 
 [14]
 In addition to the technology-based program, NRDC insisted on a provision in the agreement requiring EPA to promulgate health-based standards for six highly toxic pollutants. See National Resources Defense Council, Inc. v. Train, supra note 3, 8 ERC at 2128-2129
 
 
 [15]
 Pretreatment standards are similar to BAT effluent limitations, BADCT performance standards, and other controls prescribed by the statute in that they are "technology-based." They differ from these other controls principally in that they regulate "indirect" discharges into sewers leading into municipal treatment plants rather than "direct" discharges into receiving waters. The term "incompatible" was taken from the language of § 307(b), 33 U.S.C. § 1317(b) (1976)
 
 
 [16]
 The prescribed schedule for promulgation of regulations divided the 21 industries covered into five groups. Final regulations for the first two groups were to be promulgated by March 31, 1979, for the third group by June 30, 1979, for the fourth group by September 30, 1979, and for the final group by December 31, 1979. See R. Hall, supra note 7, at 520
 
 
 [17]
 The new regulatory program relied on authority conferred by §§ 301, 304, 306, and 307(b) & (c) of the FWPCA, 33 U.S.C. §§ 1311, 1314, 1316, 1317(b) & (c) (1976)
 
 
 [18]
 See R. Hall, supra note 7, at 516-517
 
 
 [19]
 Id
 
 
 [20]
 Id
 
 
 [21]
 Id
 
 
 [22]
 Id. Essentially, this new approach required trading off the stringency and timing of the health-based controls (the time limit for compliance with these standards was one year) for the comprehensive coverage of the technology-based approach. See also K. Hall, The Control of Toxic Pollutants Under the Federal Water Pollutant Control Act Amendments of 1972, 63 Iowa L.Rev. 609, 620-624 (1977)
 
 
 [23]
 See generally Federal Water Pollution Control Act Amendments of 1977: Hearings on Amendments to Pub.L. No. 95-200 before the Subcommittee on Environmental Pollution of the Senate Committee on Environment and Public Works, Serial No. 95-H25, Part 9, 95th Cong., 1st Sess. (1977) (hereinafter "Senate Hearings"); Implementation of the Federal Water Pollution Control Act: Hearings before the Subcommittee on Investigations and Review of the House Committee on Public Works and Transportation, 95th Cong., 1st Sess. 95-32 (Comm.Pr.1977) (hereinafter "House Hearings")
 
 
 [24]
 See Senate Hearings, supra note 23, at 71 (testimony of James T. Banks); House Hearings, supra note 23, at 621 (statement of James T. Banks and Edward L. Strohbehn, Jr.)
 
 
 [25]
 See Senate Hearings, supra note 23, at 627-628 (testimony of Thomas C. Jorling, EPA Assistant Administrator for Water and Hazardous Materials)
 
 
 [26]
 Pub.L. No. 95-217
 
 
 [27]
 The Companies contend that the 1977 Amendments "devised a new statutory framework which provided a comprehensive and workable program to control the discharge of toxic pollutants into the nation's waters." Brief for appellants at 17. NRDC, on the other hand, argues that the amendments "merely codified an existing program that EPA had been implementing under the old statute for nearly two years." Brief for appellee NRDC at 34 (emphasis in original)
 
 
 [28]
 See affidavit of James T. Banks in support of NRDC's motion of September 26, 1978, Supplemental Joint Appendix (Supp.App.) 111
 
 
 [29]
 See Supp.App. 105
 
 
 [30]
 See Supp.App. 132
 
 
 [31]
 See Supp.App. 137
 
 
 [32]
 The Companies maintain that the comments did not result in any substantive revision of the tentative agreement
 
 
 [33]
 See Supp.App. 201-210
 
 
 [34]
 See Supp.App. 198, 199
 
 
 [35]
 Appellants note that both Houses of Congress held hearings on these problems and the staff of the House Subcommittee on Investigations and Review prepared a report on their investigations into the problems of the toxics programs for the House Committee on Public Works and Transportation. See House Memorandum, 123 Cong.Rec. H12929-H12932 (daily ed. Dec. 15, 1977)
 
 
 [36]
 Specifically, appellants point to the following amendments:
 Section 301(1) specifies that neither the economic capability (301(c)) nor the water quality (301(g)) waiver of effluent limitations is applicable to toxic pollutant limitations;
 Section 307(a)(2)(1) authorizes EPA to establish effluent standards for toxic pollutants which are "more stringent" than the BAT-level effluent guidelines, if the BAT guidelines are not sufficient to protect the public health or the environment; (2) establishes the procedure EPA must follow in establishing the standards; and (3) establishes its own timetable for promulgating such standards;
 Section 307(b)(1) provides that a source discharging into a publicly owned treatment works (POTW) may have the stringency of its effluent limitations reduced to reflect the ability of the POTW to remove some or all of a toxic pollutant provided certain conditions are met;
 Section 311 authorizes EPA to regulate the plantsite runoff, spillage, waste disposal and drainage associated with the use of toxic (section 307(a)) or hazardous (section 311) pollutants;
 Section 307(b)(2)(C) (sic) 301(b)(2)(C) specifies that effluent guidelines for all the toxic pollutants specified by Congress (the list of sixty-five) must be promulgated by EPA not later than July 1, 1980;
 Section 301(b)(2)(C) specifies that discharges must comply with the effluent guidelines promulgated for the pollutants designated by Congress not later tha(n) July 1, 1984 * * *;
 Section 307(b)(2) (sic ) (§ 301(b)(2)(D)) specifies that for pollutants which EPA adds to the new section 307(a) list, compliance with the toxic pollutant guidelines is required not later than three years after such guidelines are established;
 Section 307(a) provides that the Administrator of EPA may add to or delete pollutants from the section 307(a) list, and that his decision shall be final except upon a judicial determination that it was arbitrary and capricious.
 Brief for appellants at 19-20.
 
 
 [37]
 Brief for appellants at 21
 
 
 [38]
 Appellants note that Senator Muskie, who was the floor manager of the Conference Report in the Senate, was absent from the House-Senate Conference due to illness. See 123 Cong.Rec. S19636 (daily ed. Dec. 15, 1977)
 
 
 [39]
 Natural Resources Defense Council, Inc. v. Costle, 12 ERC 1833, 1836 (D.D.C.1979)
 
 
 [40]
 Thus in System Federation No. 91 v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), the absence of an explicit declaration of congressional intent to affect the terms of the injunction at issue in that case did not prevent the Supreme Court from concluding that the District Court should have amended its outstanding decree
 
 
 [41]
 See brief for appellants at 18
 
 
 [42]
 The District Court modified the settlement agreement to conform to the new deadline for promulgating BAT regulations established by Congress
 
 
 [43]
 Natural Resources Defense Council, Inc. v. Costle, supra note 39, 12 ERC at 1836
 
 
 [44]
 See notes 24 and 25 supra
 
 
 [45]
 Similarly, in discussing a new provision dealing with compliance orders under § 309 the Senate Report noted:
 Under existing law there are no circumstances that justify a time for compliance extending beyond July 1, 1977. The Administrator can only issue an enforcement order requiring compliance within 30 days or initiate civil or criminal action. Thus, the decision of the U. S. Court of Appeals for the Sixth Circuit in Republic Steel Corporation v. Train et al. and Williams, 557 F.2d 91, (6th Cir. 1977) was an incorrect interpretation of existing law.
 S.Rep.No.95-370, 95th Cong., 1st Sess. 60 (1977), U.S.Code Cong. & Admin.News 1977, p. 4385.
 
 
 [46]
 See at 1239 supra
 
 
 [47]
 123 Cong.Rec. H12927-H12928 (daily ed. Dec. 15, 1977) (remarks of Representative Roberts)
 
 
 [48]
 Although it is true, as appellants point out, see note 38 supra, that Senator Muskie was prevented from attending the conference by ill health, in his remarks to the Senate Senator Muskie stated that he "undertook to follow the developments in the conference." 123 Cong.Rec. S19636 (daily ed. Dec. 15, 1977)
 
 
 [49]
 Senator Randolph described these same factors in explaining the decisionmaking criteria to be used by EPA's Administrator in making listing decisions. See 123 Cong.Rec. S19663 (daily ed. Dec. 15, 1977) (remarks of Senator Randolph)
 
 
 [50]
 33 U.S.C. § 1317(a)(1) (Supp. II 1978)
 
 
 [51]
 See K. Hall, supra note 22, at 622 n.80
 
 
 [52]
 The District Court further noted:
 Even if EPA were to renounce its selection criteria, the (toxic criteria) case would not be moot if the court were to determine that there was a sufficient threat of repetition of the allegedly illegal action by the agency. See, e. g., United States v. Concentrated Phosphate Export Association, Inc., 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968).
 Natural Resources Defense Council, Inc. v. Costle, supra note 39, 12 ERC at 1837 n.5.
 
 
 [53]
 The Companies note, for example, that under the old § 307 EPA was required to promulgate effluent standards for pollutants on the § 307 list within one year of the date the pollutant was placed on the list. Appellants argue that this deadline precluded the Agency from undertaking any new scientific research about a pollutant and forced EPA to rely on whatever scientific data was available at the time the pollutant was listed, which in turn became one of the 1973 criteria. The Companies contend that insofar as the 1977 Amendments eliminated the one-year time limit, EPA no longer has any reason to consider whether under the 1973 criteria adequate data are available to set standards for a particular pollutant
 
 
 [54]
 In support of this claim the Companies quote the District Court's statement that:
 Because it was the settlement as a whole that represented an acceptable bargain to both sides, it cannot be said that each portion of the Agreement is specifically responsive to a particular claim contained in one or more of the original complaints. It would do violence to the settlement for the court to attempt to separate aspects of the Agreement that rest on the arguably moot causes of action from those that do not.
 Natural Resources Defense Council, Inc. v. Costle, supra note 39, 12 ERC at 1838 (appellants' emphasis).
 
 
 [55]
 NRDC argues that the mootness doctrine does not apply to this case, maintaining that congressional action eliminating the case or controversy between the parties can only moot inchoate liabilities. It contends that once the liability has matured and has been reduced to judgment a court's original jurisdiction continues for purposes of enforcing the liability, even where the defendant needs a substantial amount of time to meet its obligations. According to NRDC, the proper analysis in cases such as this is to ascertain whether Congress intended to affect pre-existing liabilities, which it must do expressly or by necessary implication from the amending legislation. Applying this reasoning to the instant case, NRDC argues that Congress did not intend to deprive NRDC of its remedy contained in the Agreement or its right to enforce that remedy. Because we agree with the District Court that the pretreatment and toxic criteria cases are not moot, we have no need to examine NRDC's mootness argument
 
 
 [56]
 See Supp.App. 91
 
 
 [57]
 See Supp.App. 85-86
 
 
 [58]
 NRDC points out that the timetable for promulgating pretreatment standards for the eight industries listed in paragraph 13 was shorter than the timetable that applied to other industries for which pretreatment standards were to be developed. NRDC explains that this expedited schedule was included because the eight industries included a large number of indirect dischargers, see brief for appellee NRDC at 57 n.33, and because these were the only industries for which EPA could promulgate standards within 12 months. Id. See also R. Hall, supra note 7, at 522
 
 
 [59]
 Natural Resources Defense Council, Inc. v. Costle, supra note 39, 12 ERC at 1838
 
 
 [60]
 See paragraphs 3, 4, and 7 of the settlement agreement. Natural Resources Defense Council, Inc. v. Train, supra note 3, 8 ERC at 2124-2126
 
 
 [61]
 Natural Resources Defense Council, Inc. v. Costle, supra note 39, 12 ERC at 1838
 
 
 [62]
 For example, this was one of the factors EPA considered in denying petitions by Dow Chemical Company to remove certain pollutants from the § 307(a) list. See 44 Fed.Reg. 18282 (Mar. 27, 1979); 44 Fed.Reg. 34691 (June 15, 1979). Moreover, EPA's March 27, 1979 list of factors to be considered by the Agency also mentions the extent of point source discharges of the pollutant into water and the annual production and "use patterns" of the pollutants in the United States. 44 Fed.Reg. 18279 (Mar. 27, 1979). NRDC contends that the statute only permits EPA to consider the usual and potential presence of the affected organisms in water. Brief for appellee NRDC at 53. Of course we do not need to resolve the disagreement between EPA and NRDC about what factors may properly be considered by the Agency in making listing decisions. All we need do is acknowledge the existence of this controversy which indicates that the toxic criteria case is not moot
 
 
 [63]
 See Deferred Joint Appendix (Def.App.) at 20
 
 
 [64]
 See also, e. g., Liner v. Jafco, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Petersen v. Talisman Sugar Corp., 478 F.2d 73 (5th Cir. 1973)
 
 
 [65]
 In a sense Congress' action in amending the Railway Labor Act to permit union shops mooted the controversy between the employees and the railroad and the unions over whether the employees could be discriminated against because of their failure to join a union. The Supreme Court simply ruled in System Federation that the District Court should have amended the consent decree to reflect this change. The Court did not suggest that the proper procedure for the court to follow in deciding this issue was to first vacate the consent decree and then rehear the remaining controversies
 
 
 [66]
 Apparently, the first time the Companies raised this issue was in a Post-Hearing Brief filed on January 18, 1979, and this issue was only mentioned in a footnote in the brief. See brief for appellants at 44-45 n.50
 
 
 [67]
 The Companies contend that this suggestion by the District Court ignored the footnote referred to in note 66 supra, in which they had argued that the proper procedure for the District Court to follow if it were to conclude that the pretreatment and toxic criteria cases were not moot was to vacate the Agreement and rehear these two cases. However, this argument about the proper procedure to follow is not quite the same as a showing that the settlement agreement could not be supported by the remaining live controversies
 
 
 [68]
 Brief for appellants at 47
 
 
 [69]
 Natural Resources Defense Council, Inc. v. Train, supra note 3, 8 ERC at 2124
 
 
 [70]
 Paragraph 4(c) provides that:
 The Administrator shall establish and implement a program to identify and study other pollutants which are introduced into such treatment works and which are not susceptible to treatment by such works or which interfere with, pass through, or are otherwise incompatible with such works. The program shall, at a minimum, address those pollutants listed in Appendix C identifiable by computer-based mass spectra search programs ("computer matching"), and shall consist of steps to: tentatively identify by computer matching pollutants discharged by point source categories listed in Appendix B; determine frequencies of occurrence and order-of-magnitude concentrations for the tentatively identified pollutants; analytically confirm the computer identification of those pollutants found with significant frequency in at least one subcategory and in high concentrations (the term "high" to be based on comparison with the concentrations of other pollutants found or known to be in the discharge and, where possible, on readily available information with respect to toxicity of the pollutants); determine for those pollutants analytically confirmed, based upon a comprehensive literature search of the latest scientific knowledge, the kind and extent of all identifiable effects on aquatic organisms and human health; develop from the above information a list of pollutants that are candidates for national regulation; determine, by molecular structure analysis and/or laboratory test data and/or field studies, or other appropriate means where practicable, both the probable compatibility of the listed pollutants with treatment works (as defined in Section 212 of the Act) which are publicly owned, and the probable extent to which industrial technology designed to remove pollutants included in Appendix A also will remove listed pollutants. The Administrator may remove pollutants from said pollutant candidate list that he deems to be compatible with publicly owned treatment works or effectively controlled by industrial technology upon which pretreatment standards promulgated pursuant to § 307(b) of the Act are based, or are present in only trace amounts and are neither causing nor likely to cause toxic effects. The Agency shall complete this program by July 1, 1983. Immediately thereafter, the Administrator shall undertake regulatory action for those pollutants remaining on the list.
 
 
 [71]
 Natural Resources Defense Council, Inc. v. Train, supra note 3, 8 ERC at 2127-2128
 
 
 [72]
 Id. at 2128
 
 
 [73]
 Id. at 2127-2128
 
 
 [74]
 Natural Resources Defense Council, Inc. v. Costle, supra note 39, 12 ERC at 1843-1844
 
 
 [75]
 EPA is to finish identifying the pollutants and polluted waters by July 1, 1981, and is to publish its proposed strategies no later than December 31, 1981
 
 
 [76]
 EPA maintains that whereas paragraph 4 of the original Agreement appeared to require the Agency to promulgate pretreatment standards for all "incompatible" pollutants discharged by the 21 industries covered by the Agreement, paragraph 4(c) substantially limits its obligations by only requiring the Agency to initiate a program for investigating "incompatible" pollutants without specifying how many, and by allowing the Administrator to reduce the number of pollutants being studied at various steps in the investigatory process. In addition, the decision about which pollutants should be regulated is left to the Administrator's discretion
 
 
 [77]
 EPA notes that while the modifications to paragraph 12 require the Agency to develop processes for identifying contaminated waters and problem pollutants, no attempt is made to specify what these processes shall be. Moreover, the determination of the need for more stringent controls is left to the Administrator's judgment
 
 
 [78]
 Brief for appellants at 50
 
 
 [79]
 5 U.S.C. § 553(b) & (c) (1976)
 
 
 [80]
 5 U.S.C. § 551(4) (1976)
 
 
 [81]
 Brief for appellants at 53
 
 
 [82]
 5 U.S.C. § 553(b) (1976)
 
 
 [83]
 Appellants point out that in Natural Resources Defense Council v. Costle, 561 F.2d 904 (D.C.Cir.1977), this court acknowledged that the Companies had a substantial interest in the settlement agreement which could be impaired if they were limited to their right to comment on the regulations issuing at the end of the processes required by the Agreement. The court made this observation in reversing the District Court's decision denying the Companies' motion to intervene in the settlement proceedings in the District Court. Appellants maintain that they have an interest in the programs established by the modifications to the settlement agreement which is equivalent to their interest in the programs set up by the original Agreement
 
 
 [84]
 Appellants argue that EPA would have benefitted substantially if it had sought and obtained comments on the modifications. For example, there would have been an opportunity for critical examination of some of the investigatory programs mandated by the modifications. Appellants contend that now these criticisms of the programs will merely be postponed until such time as the Agency issues regulations
 
 
 [85]
 See 40 C.F.R. § 25.3(b) (1979)
 
 
 [86]
 Appellants contend that EPA officials indicated that the Agency was not disposed to undertake substantial revisions of the proposed modifications, and they maintain that the only changes made in response to their comments were corrections of grammatical errors
 
 
 [87]
 Appellants further argue that EPA's actions in developing and agreeing to the modifications are deficient because they failed to comply with the requirements of Executive Order No. 12044, 43 Fed.Reg. 12661 (Mar. 24, 1978). The Companies contend that the Order complements the APA by explicitly requiring regulatory agencies to provide an opportunity for public participation in the development of "significant regulations." Id. at 12662. Appellants maintain that the Executive Order also required EPA to prepare a "regulatory" or economic "analysis" which was to include a description and evaluation of the "major alternative ways of dealing with the problem that were considered," the "economic consequences of each of these alternatives," and "the reasons for choosing one alternative over the others." Id
 
 
 [88]
 Appellants cite Cunningham v. English, 269 F.2d 539 (D.C.Cir.), cert. denied, 361 U.S. 905, 80 S.Ct. 195, 4 L.Ed.2d 152 (1959), as an illustration of this principle
 
 
 [89]
 See Part II-D infra
 
 
 [90]
 Appellants' notice and comment arguments are sometimes presented as objections to the original settlement agreement as well as the modifications. See, e. g., reply brief for appellants at 30-31 & n.20. Since the Companies did not object to the District Court order approving the original settlement agreement, they may not now raise notice and comment objections to the original agreement. Thus our consideration of their notice and comment challenges is limited to the modifications
 
 
 [91]
 In contrast, the FTC order in FTC Line of Business Report Litigation actually required the companies to do something-prepare and submit the requested reports. Appellants attempt to distinguish the latter case from the one at bar by suggesting that the FTC program involved data collection only, whereas the modifications set up programs for both data collection and data evaluation. In fact the FTC program was not limited to data collection. See Appeal of FTC Line of Business Report Litigation, 595 F.2d 685, 690-693 (D.C.Cir.1978). Moreover, the mere fact that an investigatory program includes both data collection and data evaluation (it is difficult to imagine how there can be an investigatory program which does not involve evaluation) does not make it a rule for which notice and comment must be allowed
 
 
 [92]
 Brief for appellants at 55
 
 
 [93]
 Under this theory EPA would be required to initiate "rulemaking" proceedings to decide what investigatory programs it can set up to help it determine whether it should undertake to promulgate regulations. It is not immediately clear why this first "rulemaking" should not itself be preceded by "rulemaking" to determine what procedures should be employed to decide whether there is a need for an investigatory program in the first place
 
 
 [94]
 We also do not believe that the Companies' reliance on this court's decision in Natural Resources Defense Council v. Costle, supra note 87, helps their case. Our conclusion in that case that the Companies had an interest in the settlement proceedings which satisfied the requirements for intervention pursuant to Fed.R.Civ.P. 24(a) does not establish that the modifications have the type of immediate and direct effect on the Companies that is a prerequisite to a finding that the modifications constituted rulemaking within the meaning of the APA
 
 
 [95]
 33 U.S.C. § 1251(e) (Supp. II 1978)
 
 
 [96]
 See 40 C.F.R. § 25.2(a)(5) (1979)
 
 
 [97]
 It should be noted that even if we were to agree with appellants' suggestion that the CWA's public participation provisions apply to the modifications, we would still reject their contention that EPA contravened these requirements. Neither the CWA nor EPA's implementing regulations establish any requirement that "plans" and "programs" be subject to formal notice and comment. The CWA does not set forth any specific mechanisms for public participation and EPA's regulations confirm this fact. See 44 Fed.Reg. 10286 (Feb. 16, 1979)
 
 
 [98]
 We also reject appellants' suggestion that EPA contravened Executive Order No. 12044. Even assuming that this Order is judicially enforceable, but see Manhattan-Bronx Postal Union v. Gronouski, 350 F.2d 451, 456 (D.C.Cir.1965), cert. denied, 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 236 (8th Cir. 1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976), by its very terms the Order only applies to "significant regulations." As we have already indicated, the modifications do not establish any regulations so the Order does not apply to this case. We should also add that appellants' "pubic policy" arguments that EPA should have provided notice and an opportunity for comment, even if correct, do not create any legal requirements
 
 
 [99]
 The Companies' brief adverted to this issue in connection with their argument that the modifications constituted rulemaking, but did not present it as an independent objection to the modified settlement agreement
 
 
 [100]
 Supplemental brief for appellee NRDC at 3 n.4
 
 
 [101]
 It is not clear whether NRDC's suggestion that the District Court is free to amend the decree to accommodate any legitimate change of mind the Administrator may have, see supplemental brief for appellee NRDC at 28-32, indicates that it agrees with this
 
 
 [102]
 See Response of the Administrator of the Environmental Protection Agency to the Court's Order of April 17, 1980 at 2